# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE

In re

CARL RUBLE TAYLOR, JR.

        Debtor

Case No. 07-31579

CARL RUBLE TAYLOR, JR.

        Plaintiff

v.

FREEMAN'S FURNITURE, INC.,
d/b/a FREEMAN'S FURNITURE
AND APPLIANCES

        Defendant

Adv. Proc. No. 08-3115

## M E M O R A N D U M

**APPEARANCES:**    MAYER & NEWTON
        John P. Newton, Jr., Esq.
        1111 Northshore Drive
        Suite S-570
        Knoxville, Tennessee  37919
        Attorneys for Plaintiff/Debtor

        McSWEEN & McSWEEN
        Jeffery S. Greene, Esq.
        321 East Broadway
        Newport, Tennessee  37821
        Attorneys for Defendant

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiff on August 19, 2008, seeking a determination that the Defendant violated 11 U.S.C. § 525(b) (2006) by terminating his employment after he filed for bankruptcy; that the Defendant willfully violated the automatic stay provisions of 11 U.S.C. § 362(a) (2006) by demanding payment on a prepetition debt; and that the actions of the Defendant entitle the Plaintiff to actual damages, including attorney's fees, and punitive damages pursuant to 11 U.S.C. § 105(a) (2006) and 11 U.S.C. § 362(k) (2006).[1]

The trial was held on February 23, 2009. The record before the court consists of twelve exhibits introduced into evidence, along with the testimony of four witnesses, Robert Grooms, Assistant Manager of the Defendant, Paul T. Freeman, Vice President of the Defendant, Bret Daniel Freeman, Assistant Manager of the Defendant, and the Plaintiff.

This is a core proceeding. 28 U.S.C. § 157(b)(2)(A), (O) (2006).

**I**

The Plaintiff filed the Voluntary Petition commencing his Chapter 13 case on May 16, 2007.[2] At the time he filed his case, the Plaintiff had been employed by the Defendant for three years as a debt collector for its Broadway store in Newport, Tennessee. The Plaintiff also performed deliveries for the Defendant when necessary. His employment continued until he was terminated on

---

[1] The Defendant was erroneously identified in the Complaint solely by its trade name, Freeman's Furniture and Appliances. By agreement in open court prior to trial, the Complaint was amended to correctly set forth the name of the Defendant as Freeman's Furniture, Inc., d/b/a Freeman's Furniture and Appliances.

[2] The Plaintiff's Chapter 13 case has since been dismissed due to plan arrearages pursuant to an Order entered on June 12, 2008.

2

January 18, 2008. Pursuant to the Separation Notice provided to him by his manager, the reason for the Plaintiff's termination was "no reason required." TRIAL EX. 5.

In addition to being the Plaintiff's employer at the time his bankruptcy case was filed, the Defendant was also a creditor of the Plaintiff, listed in the Plaintiff's statements and schedules as holding a nonpriority unsecured claim in the amount of $7,000.00. *See* COLL. TRIAL EX. 1. Between the date he filed his case through December 2007, the Plaintiff made payments totaling $553.50 to the Defendant on the prepetition debt he owed. TRIAL EX. 8. Additionally, on August 4, 2007, the Plaintiff signed a handwritten note acknowledging that he had borrowed $130.00 from the cash register post-petition and agreed to repay this obligation to the Defendant at $25.00 per week. TRIAL EX. 7.

On January 15, 2008, the Plaintiff's attorneys sent a letter to the Defendant at its 432 East Broadway, Newport, Tennessee 37821 office address, stating that the Debtor had advised his office that demands for payment on the Plaintiff's account had been made and that such demands violated the automatic stay. TRIAL EX. 4. In response, Clyde A. Dunn, attorney for the Defendant, sent a letter dated January 18, 2008, to the Plaintiff's attorneys, advising that the Plaintiff had approached Paul Freeman concerning a refinance of his account, which Mr. Freeman declined to do "because of the ongoing Chapter 13 case" and denied that the Defendant violated the automatic stay. TRIAL EX. 13.

The Plaintiff filed the Complaint initiating this adversary proceeding on August 19, 2008, alleging that the Defendant terminated him due to his bankruptcy filing because no other cause

3

existed and the company had a continuing need for someone to hold his position. Additionally, the Plaintiff avers that, prior to his termination, the Defendant continued making demands and putting pressure on the Plaintiff to make installment payments on his prepetition debt directly to it post-petition, in violation of the automatic stay.

## II

The Plaintiff first requests that the court find the Defendant in violation of 11 U.S.C. § 525(b), which provides:

> No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—
>
> (1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;
>
> (2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or
>
> (3) has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(b). "Section 525(b) of the Bankruptcy Code specifically and emphatically prohibits discrimination by an employer based on the employee's having taken advantage of a right created by federal statutes, i.e., the right to file for bankruptcy protection from creditors." *Bradford v. J.C. Bradford & Co. (In re Bradford)*, 181 B.R. 910, 915 (Bankr. E.D. Tenn. 1995).

The Sixth Circuit has held that "solely because" means what it says, that for a plaintiff to be successful under this section of the Bankruptcy Code, the termination must have been based "solely

upon" the filing of the bankruptcy, *White v. Kentuckiana Livestock Market, Inc.*, 397 F.3d 420, 426 (6th Cir. 2005), and the debtor must prove that the employer "applied some different rule, condition or treatment based solely on one of the bankruptcy related characteristics listed in the statute." *Browning v. Tennsco Corp. (In re Browning)*, 176 B.R. 805, 807 (Bankr. M.D. Tenn. 1995).

The Plaintiff contends that he was fired from his position with the Defendant on the same date that the Defendant received the letter from his attorneys marked as Trial Exhibit 4 which directed the Defendant to cease making demands for payment on the Plaintiff's account in violation of the automatic stay. On the other side, the Defendant contends that the Plaintiff was terminated due to his work performance, namely because collections had risen, as well as his tardiness and wasting of company time. Based upon the record presented and the requirements of the statute, the court finds that the Defendant did not violate § 525(b) when it terminated the Plaintiff on January 18, 2008.

The Plaintiff testified, and the record reflects, that he had been employed with the Defendant as a collector for three years, from November 2004 through January 2008. *See* TRIAL EX. 12. In addition to collections, the Plaintiff testified that he performed other duties, including installations, repairs, and deliveries when necessary. With respect to his collection requirements, the Plaintiff testified that he usually sought to collect the "worst" accounts first, by calling and then leaving notes on the customers' doors, but that he had no set quotas to meet. He also testified that he was unable to focus on collections full-time due to his other responsibilities within the store.

When questioned about his job performance and the reason for his termination, the Plaintiff testified that he had always had an excellent work record, with no criticisms or reprimands, and prior to losing his job, he was unaware that there were any problems with his work performance. As for the termination itself, the Plaintiff testified that when he was handed the separation notice by Paul Freemen on January 18, 2008, Mr. Freeman was holding the January 15, 2008 letter from the Plaintiff's attorneys in his other hand. The Plaintiff also testified that Mr. Freeman did not explain why he was being let go and he was not allowed to clean his personal items out of his desk before having to leave the premises.

In support of their position that the Plaintiff was not terminated in violation of § 525(b), the Defendant offered the testimony of three witnesses, Paul Freeman, Bret Freeman, and Robert Grooms. Paul Freeman, Vice President and co-owner of the Defendant, worked in the Broadway store with the Plaintiff. He testified that the Plaintiff's primary job was the collection of accounts, although he did help out from time to time with installations, repairs, and errands. With respect to the Plaintiff's job performance, Paul Freeman testified that he personally liked the Plaintiff and although he had, in the past, noticed the Plaintiff making phone calls that he suspected had not been work-related, there were no problems with his job performance until December 2007, when Paul Freeman learned that the collections had risen over $100,000.00 in six months. Paul Freeman testified that after this discovery, he and his brother, the other co-owner, discussed the situation with Jack Cutshaw, the Broadway store manager, and decided to terminate the Plaintiff. Paul Freeman identified his signature on the Separation Notice and acknowledged that he did not give the Plaintiff any prior warnings before terminating him, testifying that he did not believe he had to. He also

6

testified that he was unaware that the Plaintiff was in bankruptcy and that he had no recollection of having ever seen the January 15, 2008 letter from the Plaintiff's attorneys.

Also testifying was Bret Freeman, assistant manager of the Defendant's second store, son of the other co-owner, and nephew of Paul Freeman. Bret Freeman testified that he handles the collections for the other store and that he spoke with the Plaintiff at least once a week, although they did not work together. Bret Freeman also testified that he compiles the inventory and financial data for both store locations and prepares delinquency reports breaking down the information by store using a computer program and running reports in June and December. He testified that the December 2007 report reflected that delinquencies in the Broadway store were up over $105,000.00, while the other store's delinquencies had decreased, and he had contacted his father with this information, who then contacted Paul Freeman. With respect to the Plaintiff's termination, Bret Freeman testified that he believes Mr. Cutshaw may have had knowledge of the January 15, 2008 letter from the Plaintiff's attorneys, but that Paul Freeman did not. He also testified that Mr. Cutshaw handled the day-to-day operations of the Broadway store, but that it was Paul Freeman's signature on the Separation Notice.

The final witness was Robert Grooms, assistant manager for the Broadway location, who was a co-worker with the Plaintiff but was not his supervisor. With respect to the Plaintiff's job performance, Mr. Grooms testified that during the course of his employment with the Defendant, the Plaintiff made many personal telephone calls, left early or came in late on average of almost once per week, and that he had once received a massage from a female while on the clock. Mr. Grooms also testified that he recalled Paul Freeman discussing delinquent accounts with the Plaintiff,

sometimes directing him to work on certain accounts. Mr. Grooms testified that he was present on January 18, 2008, when the Plaintiff was terminated and that their secretary filled out the paperwork, but Mr. Freeman signed the Separation Notice and personally gave it to the Plaintiff. He testified that the Plaintiff was angry when he left the store and that when he came back to get his personal items another day, he made the statement that "Mr. Freeman had messed up. I will own Freeman's Furniture." When questioned about the relationship between the Plaintiff and Paul Freemen, both Mr. Grooms and Bret Freeman testified that Paul Freeman liked the Plaintiff, with Mr. Grooms stating that he was good to the Plaintiff and Mr. Freeman stating that his uncle let the Plaintiff get away with things.

From the testimony of the witnesses, it is evident that the Plaintiff was not terminated solely because of his bankruptcy case. Paul Freeman, co-owner of the Defendant, testified that he and his brother, the other co-owner, made the decision to terminate the Plaintiff after collections in the Broadway store rose to over $100,000.00 between June and December 2007, and that he has not replaced the Plaintiff with anyone else. Whether or not the January 15, 2008 letter from the Plaintiff's attorneys to the Defendant was potentially a factor, based upon the evidence presented, it was clearly not the sole factor, and there has been no violation of § 525(b).

### III

The Plaintiff additionally alleges that the Defendant violated the automatic stay by requiring him to continue making installment payments on his prepetition account while making payments in

8

his Chapter 13 case. The commencement of a bankruptcy case triggers the protection of the automatic stay of § 362(a), which provides, in material part as follows:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301 . . . operates as a stay, applicable to all entities, of—
>
> . . . .
>
> > (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; [or]
> >
> > . . . .
> >
> > (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]

11 U.S.C. § 362. The automatic stay remains in effect throughout the pendency of the bankruptcy case, providing debtors with "'a breathing spell' from collection efforts and to shield individual creditors from the effects of a 'race to the courthouse,' thereby promoting the equal treatment of creditors." *In re Printup*, 264 B.R. 169, 173 (Bankr. E.D. Tenn. 2001). Actions taken in violation of the automatic stay are "invalid and voidable and shall be voided absent limited equitable circumstances[,]" *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993), and it is the court's responsibility to determine whether a violation was willful, thus requiring imposition of the statutory sanctions set forth in § 362(k)(1).

"A violation is willful if 'the creditor deliberately carried out the prohibited act with knowledge of the debtor's bankruptcy case.'" *Printup*, 264 B.R. at 173 (quoting *Walker v. Midland Mortgage Co. (In re Medlin)*, 201 B.R. 188, 194 (Bankr. E.D. Tenn. 1996)).

> A specific intent to violate the stay is not required, or even an awareness by the creditor that her conduct violates the stay. It is sufficient that the creditor knows of

>the bankruptcy and engages in deliberate conduct that, it so happens, is a violation of the stay. Moreover, where there is actual notice of the bankruptcy it must be presumed that the violation was deliberate or intentional.
>
>Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages.

*Printup*, 264 B.R. at 173 (quoting *In re Daniels*, 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997)); *see also In re Dunning*, 269 B.R. 357, 362 (Bankr. N.D. Ohio 2001) (a willful violation of the automatic stay does not require a specific intent to violate the stay).  If the court has determined that a willful violation occurred, § 362(k)(1) mandates an award of actual damages, including costs and attorneys fees, and "in appropriate cases, [an injured debtor] may recover punitive damages."  11 U.S.C. § 362(k)(1).

"Punitive damages are appropriate to deter a pattern of behavior that ignores the automatic stay."  *In re Kortz*, 283 B.R. 706, 713 (Bankr. N.D. Ohio 2002) (holding that "[w]hen pre-petition creditors ignore § 362 of the Code, they do so at their peril.").  Additionally, "[i]f the bankruptcy court believes that the amount of such actual damages is insufficient to deter the kind of deliberate and repeated violations of the automatic stay which evident in this case, the bankruptcy court is free to impose an appropriate amount of punitive damages."  *Dunning*, 269 B.R. at 363 (quoting *Archer*, 853 F.2d at 500).  In determining whether punitive damages are appropriate, the court should consider (1) the nature of the creditor's conduct; (2) whether the creditor has the ability to pay damages; (3) the creditor's motives in violating the stay; and (4) whether there was any provocation by the debtor.  *Emberton v. Lobb (In re Emberton)*, 263 B.R. 817, 826 (Bankr. W.D. Ky. 2001). Generally, an award of punitive damages requires a showing of egregious and intentional misconduct.  *See, e.g., Kortz*, 283 B.R. at 713 (despite numerous notices of the debtors' bankruptcy

case from the debtors, their attorney, and the court, the creditor continued making threatening, belligerent calls to the debtors both at home and at work).

The record evidences that the Plaintiff made six post-petition payments to the Defendant totaling $553.50, as follows: (1) $139.35 on May 30, 2007; (2) $75.00 on June 25, 2007; (3) $64.15 on August 29, 2007; (4) $75.00 on September 27, 2007; (5) $100.00 on November 30, 2007; and (6) $100.00 on December 31, 2007. TRIAL EX. 8. It also evidences that on August 4, 2007, the Plaintiff executed a note to the Defendant in the amount of $130.00, representing a post-petition obligation to be paid back at $25.00 per week. TRIAL EX. 7.

In support of his contention that the Defendant violated the automatic stay, the Plaintiff testified that before he filed his case, he owed $139.75 per month to the Defendant on his account. He also testified that even after the filing of his bankruptcy case Paul Freeman would make comments about the Plaintiff's account being behind and that he needed to make payments. The Plaintiff testified that, believing that he would lose his job if he did not do so, he made the six post-petition payments directly to the Defendant between May 30, 2007, and December 31, 2007, but that when his budget got too tight and he could no longer afford to make payments to the Defendant in addition to the Chapter 13 trustee, he contacted his attorneys who then sent the January 15, 2008 letter to the Defendant.

When questioned about whether the Plaintiff was forced to make payments, Paul Freeman testified that he never talked to the Plaintiff about his bankruptcy case or about making payments on his account; that the Plaintiff was never threatened that he would lose his job if he did not make

11

payments; and that no money was deducted from the Plaintiff's paycheck on the account. Paul Freeman also testified that he made the additional loan of $130.00 to the Plaintiff in August 2007, after he filed for bankruptcy. Similarly, both Bret Freeman and Mr. Grooms testified that neither they nor anyone else from either of their stores demanded any payments from the Plaintiff but that the Defendant accepted the Plaintiff's voluntary payments, notwithstanding the knowledge that he was in bankruptcy.

Based upon the record before it, the court cannot find that the Defendant violated the automatic stay by coercing or pressuring the Plaintiff to make payments on his prepetition obligations. Other than the Plaintiff's testimony, which was rebutted by the three other witnesses, there is no proof that any representative of the Defendant demanded payments from the Plaintiff. There were six post-petition payments made by the Plaintiff to the Defendant; however, all but two of those were also made after the Plaintiff executed the August 4, 2007 Note to the Defendant, which required him to make payments of $25.00 weekly until paid in full. Furthermore, the Bankruptcy Code does not prohibit a debtor from making a voluntary payment on a prepetition debt. *See* 11 U.S.C.§ 524(f) (2006) ("Nothing . . . prevents a debtor from voluntarily repaying a debt.").

The Plaintiff's testimony that he believed he would be fired from his job if he did not make payments on his prepetition account balance loses credibility when the sporadic timing and payment amounts are considered.[3] The Plaintiff made payments at the end of May, June, August, September,

---

[3] The Plaintiff's testimony on this issue, however, was consistent. He was asked both on direct and cross examination whether anyone working for the Defendant told him he would lose his job if he did not continue to make payments, but he never responded with a "yes" or "no." Rather, he testified, "I knew if I didn't pay I wouldn't have a job" and "It just stood to reason [that I wouldn't have a job if I didn't pay]." When asked on cross examination by the Defendant's counsel "But Mr. Freeman or no one else with Freeman's ever told you if you don't make these payments
(continued...)

12

November, and December, but did not make any payments in the months of July or October. Additionally, he testified that the original payment amount was $139.75 per month, but none of the payments made equaled that amount.

### IV

In summary, the court finds that the Defendant did not violate 11 U.S.C. § 525(b) when it terminated the Plaintiff from his employment on January 18, 2008, nor did it violate the automatic stay provisions of 11 U.S.C. § 362(a) with respect to the Plaintiff's prepetition debt in the amount of approximately $7,000.00 owed to it. The Plaintiff's Complaint shall be dismissed.

A judgment consistent with this Memorandum will be entered.

FILED: April 9, 2009

BY THE COURT

/s/  RICHARD STAIR, JR.

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

---

[3](...continued)
you would be fired," the Plaintiff responded, "Not directly." The Plaintiff's speculative internalized beliefs as to what might occur if he failed to pay on his account cannot be imputed to the Defendant.